# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 75378-9-I |
| | ) | |
| AMEENA AAMER, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SHARIEF YOUSSEF, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: June 19, 2017 |
| | ) | |

VERELLEN, C.J. — Sharief Youssef appeals the parenting plan entered in proceedings dissolving his marriage to Ameena Aamer. He contends the court abused its discretion in adopting a court-appointed expert's recommendations because other experts testified that the expert's underlying report was unreliable, incomplete, and culturally biased. Because we defer to the trial court on matters relating to the weight and persuasiveness of expert testimony and because the court did not abuse its discretion in any event, we affirm.

## FACTS

Ameena Aamer and Youssef married in June 2014 and separated three months later. They have a daughter, H.Y., born in March 2015. Aamer and Youssef are both practicing Muslims.

and submit a written report to the court. The order described the report's requirements as follows:

> The parenting evaluator shall investigate and report factual information to the court concerning parenting arrangements for the child. The parenting evaluator may make recommendations based upon an independent investigation regarding the best interests of the child.
>
> The parenting evaluator shall make a full and complete written report to the court . . . . This report shall include recommendations and bases for those recommendations.
>
> Issues ordered to investigate and report:
>
> > All issues relating to development of a parenting plan
> > A recommended (final) parenting schedule [1]

On March 14, 2016, Dr. Hedrick issued her report, which the court later admitted at trial. The report stated that Dr. Hedrick interviewed Aamer and Youssef for roughly 3.5 hours apiece and observed each of them with H.Y. for one hour. She spoke with Youssef's former therapist, Salma Albugidieri, H.Y.'s physician, Dobrina Okorn, and Shaker Alsayed, an imam who consulted with Youssef regarding several of his marriages. Dr. Hedrick also administered psychological tests and questionnaires to Youssef and Aamer.

The report summarized the parties' brief marriage and their versions of what took place during the marriage. Dr. Hedrick quoted Aamer's recollection of the wedding, honeymoon, and early days of the marriage:

> After the ceremony he said, "I haven't booked your honeymoon ticket." He had only booked his. . . . We went to Turkey and there were no hotel reservations. He would videotape people while he was dealing with them. . . . Something didn't feel right. Sex didn't seem genuine—it was like he was reading from a manual. . . . In Maryland, he didn't seem interested. . . . I got the sense he was forced to marry me. I thought

---

[1] Clerk's Papers (CP) at 526.

something was wrong with me. He wouldn't go forward with sex unless I initiated it. . . . It was as if he was obligated. . . . He would blame me for the pregnancy. . . . He signed up to take four courses on random things. There was no time to do anything because he wouldn't get home until 9-9:30 p.m. He was doing it to stay away.[2]

Youssef remembered the honeymoon more idyllically and described the early relationship as a "happy relationship with only two arguments."[3]

The report recounted an incident during which the couple argued over rent money and Aamer decided to go stay with her parents. According to Aamer, Youssef called her after the argument and said, "I need a detailed email of what you've done, what you've said."[4] Youssef then went to Aamer's parents' house and demanded that Aamer leave with him. Aamer said, "No."[5] When Youssef persisted, her father threatened to call the police.

Shortly after this incident, Aamer went to Youssef's parents and talked to his father. Youssef's father then talked to Youssef in private. According to Aamer, Youssef

came out furious. He took me to the basement, pulled me by the hand. He was forcing a kiss on me and said, "Let's pray." Then he said, "Who did you talk to today[?] [Y]ou're a liar." I reached for my phone and he took it away. He called his father and said, "I hugged her like you said." His dad came and they had an argument. . . . I didn't feel safe spending the night. His father told him "[Y]ou have no right to control her money in any way.". . . I didn't feel safe and didn't know who I was dealing with. I was scared. I decided to go to Pittsburgh.[6]

Youssef denied grabbing Aamer and said he took her phone accidentally. He claimed she had agreed to share rent and to not include family in their financial discussions.

---

[2] CP at 804.

[3] Id.

[4] Id.

[5] Id.

[6] CP at 804-05.

After the rent incident, Aamer, who was pregnant with H.Y., left with her parents for Seattle. According to Youssef, Aamer refused to answer his calls or communicate with him about the pregnancy. Three months later, Aamer filed for divorce. A few months after that, she gave birth to H.Y.

Youssef immediately received access to H.Y., starting with two hours a day and expanding to three eight-hour visits per week after he moved to Seattle.

In summarizing her interviews and observations, Dr. Hedrick stated that both parents demonstrated positive interactions with H.Y. She described Aamer as "cheerful," "warm and likeable."[7] She described Youssef as "somewhat socially awkward, deferential, and guarded. He appeared to routinely minimize information that he perceived would reflect badly on him."[8] His "[a]ffect was contained" and he sometimes answered questions with "tedious detail" and "evasiveness."[9]

The parents' psychological test results were mostly near the norm. Youssef exhibited some defensiveness, shyness, and social avoidance while Aamer exhibited some suspiciousness, alienation, and preoccupation with death or suicide. Dr. Hedrick noted that Aamer's preoccupation with death or suicide appeared to arise from her Muslim beliefs about the afterlife, and her suspiciousness and alienation "appeared to be strictly related to issues around her divorce."[10]

The report also summarized Dr. Hedrick's interviews with collateral contacts. Salma Abugideiri, Youssef's therapist, said Youssef came to see her in 2014 "after two

---

[7] CP at 806.

[8] Id.

[9] Id.

[10] CP at 807.

previous marriages. . . . There had been two bad break ups and he had been suffering previously from depression characterized by negative cognitions."[11] Youssef "was taking classes and working but he was focused on negative cognitions. . . . He tended to catastrophize and had paranoid thoughts arising out of trust issues related to the divorces."[12] Youssef described his first wife as "immature and dependent. He felt they didn't connect intellectually."[13] Youssef subsequently received treatment for depression in 2007 and 2008. He called off his second marriage in 2009, and the bride's parents sued him. He suffered depression again and took antidepressants.

Youssef told Abugideiri that Aamer "tended to shut down" and that he reached out to her after the cell phone incident "but there was no communication."[14] After they separated, Youssef was "terrified that he was going to lose this child. Because of his fear and because he had no parenting skills and minimal relationship skills, he started taking classes."[15] Youssef was committed to treatment and "open to feedback and to working on himself."[16]

H.Y.'s physician, Dr. Okorn, told Dr. Hedrick she had no concerns about either parent. She noted, however, that Youssef had "a reputation for being pushy about getting records."[17]

---

[11] CP at 808.
[12] Id.
[13] Id.
[14] Id.
[15] Id.
[16] CP at 809.
[17] Id.

Imam Shaker Alsayed counseled Youssef and his first wife for 10 months. Youssef's wife complained that he "was not treating her well, that he was not kind. There were heavy expectations."[18] The imam said Youssef was not independent from and was hampered by his father. His father "treated him like a child."[19]

The imam told Dr. Hedrick that when Aamer left Youssef, [t]here were money issues again and oppressive pressure on him to help his father financially."[20] Youssef "was more motivated by protecting his assets than his marriage. He looks at a wife as a financial burden. Money and character are underpinning issues that make his father speak for him."[21]

The imam also stated that, following his interview with Dr. Hedrick, Youssef called and asked

> about what [Dr. Hedrick] had asked and what I had said. I told him it was not up to me to discuss. He put his father on the phone and his father began threatening me . . . . Then his father came to my office and barged in without an appointment. I refused to see him. . . . His father has ruined [Youssef's] married life by being over-protective and over-involved.[22]

Dr. Hedrick opened the discussion portion of her report by stating that the evaluation "was notable for issues surrounding the difficulties inherent in evaluating across significant cultural and religious lines."[23] As the evaluation progressed, "it became apparent that [Aamer] had significant concerns about [Youssef]," particularly

---

[18] Id.

[19] Id.

[20] Id.

[21] Id.

[22] CP at 810.

[23] Id.

6

his "interpersonal functioning and his ability to manage conflict appropriately."[24] Aamer "described with credible detail the events that led to her decision to leave him and which included behavior that was disrespectful and dominating."[25]

Dr. Hedrick stated that the imam's statements to her "strongly suggested that [Aamer's] concerns regarding [Youssef] were apt to constitute a pattern that existed in his other two marriages as well."[26] All of the marriages had "prominent difficulties around money," and their short duration "suggests that these difficulties were not merely situational in nature, or the result of cultural issues around legal versus religious marriages."[27] In addition, the imam's observations showed that Youssef's marriages also suffered from his father's undue interference.

Dr. Hedrick concluded that Youssef was not forthcoming about his mental health history and an arrest for sexual solicitation in 2006. This behavior, together with inaccuracies or minimizations in Youssef's statements to her raised "significant doubts about Youssef's credibility."[28] According to Dr. Hedrick, "[t]he pattern that emerges from these concerns appears to revolve around significant difficulties in [Youssef's] interpersonal skills, including deficits in his ability to deal maturely with conflict."[29] She noted "some confirmation of this in the MMPI-2 RF test results that indicated mild elevations around social avoidance, shyness, and interpersonal passivity."[30] She

---

[24] Id.

[25] Id.

[26] Id.

[27] Id.

[28] CP at 811.

[29] Id.

[30] Id.

concluded "[Youssef's] minimization of difficulties is also apt to interfere with co-parenting in that [Aamer] perceives him as potentially not being straightforward with her about [H.Y.]."[31] Without focused work on his tendency to hide or distort information, Youssef "will likely create a situation in which there is more and more distrust with [Aamer], making parenting more difficult for both of them."[32]

Dr. Hedrick also saw "an obsessive quality [in Youssef's] view of himself in the father role."[33] His decision "to get a degree in early childhood education in addition to numerous classes and baby groups underscore[d] [Aamer's] observation that during their marriage [Youssef] signed up for numerous 'random' courses in order to 'stay away' from her."[34] Dr. Hedrick stated that "[t]he extent to which his apartment is populated by 'Baby Einstein' toys and the way in which he discusses [H.Y.'s] interest in them in terms of developmental tasks is unsettling. [Youssef] appears to avoid areas that require affective skills (empathy, for example) in favor of intellectual activities."[35] Dr. Hedrick concluded there was

> a need to look ahead and identify potential trouble spots. Given [Youssef's] interpersonal difficulties and his intense focus on [H.Y.'s] development, there is a concern that he will remain hyper-focused on her in a way that eventually interferes with her interaction with the larger world. Unless [Youssef] develops better skills for adult interactions, he is apt to look solely to [H.Y.] for gratifying his needs for social interaction.

. . . .

---

[31] CP at 812.

[32] Id.

[33] Id.

[34] CP at 811.

[35] Id.

Research indicates that the wellbeing of children whose parents have divorced is best correlated with quality of parenting and frequency of contact rather than the absolute number of hours in each parent's physical custody. This suggests that [H.Y]'s needs are apt to best be met by improving her father's interpersonal functioning and his ability to relate empathically to her needs before commencing overnight contact.[36]

The report recommended that Youssef enroll in group therapy to improve "his interactional skills with adults."[37] This would not only "improve his ability to communicate with [Aamer] but [would] also . . . improve the likelihood that [H.Y.] will not become the sole source meeting his interactional needs."[38] After a year of weekly group therapy, Youssef could begin having overnights with H.Y. Youssef's residential time would expand when H.Y. turned three and would be rearranged when she entered kindergarten.

At trial, Dr. Hedrick reiterated the concerns expressed in her report, stating,

[W]hen I looked at all the data [I had] concerns about [Youssef's] functioning in the interpersonal arena, because three very short marriages and the information that I collected from elsewhere about some of the problems that arose in those marriages left me with concerns. Both about his ability to interact in a reciprocal empathic way with a partner, but also his ability to handle conflict. And a tendency to . . . be disrespectful and at times dominating in a way that created problems . . . . And potentially could create problems in terms of parenting a child, both in terms of the interaction with the other parent, but also in terms of what he modeled for the child about interpersonal male-female relationships.[39]

Dr. Hedrick was particularly concerned with Youssef's ability to handle high conflict situations. She testified that such situations had resulted in Youssef blaming Aamer for the pregnancy, taking her phone, and grabbing her and forcing a kiss on her.

---

[36] CP at 812-13.

[37] CP at 813.

[38] Id.

[39] Report of Proceedings (RP) (Apr. 20, 2016) at 29.

With respect to Youssef's hyper-focus on H.Y., Dr. Hedrick testified that this trait

> was very likely to be problematic in the long run. . . [Youssef] can get very focused on issues in a compulsive, kind of obsessive way. And for this child, my concern was that that would be experienced as very limiting. And that she would have difficulty meeting his social needs and that that would in some ways warp their relationship and place undue burdens on her as she got older.[40]
>
> . . . .
>
> And . . . this very obsessive focus would get directed at [H.Y.]'s development in a way that would keep him from seeing her as autonomous from him. Like she's a project.[41]

Dr. Hedrick testified that Youssef's obsession with taking classes went "well beyond" anything she'd seen in her 30-year career.[42]

Two experts testified for Youssef. Dr. Gary Wieder, a clinical and forensic psychologist, testified that he had conducted several hundred parenting evaluations. He found several flaws in Dr. Hedrick's report and methodologies. He testified that there is no scientific link between parenting deficits and the interpersonal skills and/or hyper focus alluded to in Dr. Hedrick's report. He also testified that Dr. Hedrick's recommendation to postpone overnights for Youssef was "inconsistent with best practice models."[43] Dr. Weider criticized the report for failing to consider contradictory evidence, potentially contradictory collateral sources, and parenting inventories, failing to treat data and information about the parents equally, failing to address alternative hypotheses, and misinterpreting or distorting test results. In Dr. Weider's view,

---

[40] Id. at 37.

[41] Id. at 53.

[42] Id.

[43] RP (Apr. 25, 2016) at 247.

10

Dr. Hedrick's use of only three collateral sources was unusually low for an evaluation. Many of these flaws he claimed created an appearance of "confirmatory bias."[44]

Dr. Daniel Rybicki, a psychologist specializing in psychological and parenting evaluations, echoed many of Dr. Wieder's criticisms of the report. He testified that the 15-page report was the shortest he had seen in 30 years and that a typical parenting evaluation report would run 60 to 70 pages in length. He said the report failed consider plausible rival hypotheses, ignored contradictory data, flew in the face of research evidence, and was "actually one of the most skewed reports I've seen over the course of my professional career."[45] The report was also "deficient in the logical nexus from the data to the findings, deficient in terms of making steps to guard against confirmatory bias," deficient in accounting for cultural explanations for behavior and test results, and selective in its attention to data in a way that suggests confirmatory bias.[46] He defined "confirmatory bias" as "the tendency to . . . selectively hear and attend the information that fits a previously held hypothesis."[47]

Aamer testified and corroborated the statements Dr. Hedrick attributed to her. She also testified to Youssef's obsession with making video recordings of his interactions with people. On their honeymoon, he recorded the paperwork process at a car rental company with his phone camera. He also recorded their exchanges of H.Y. using cameras set up in his minivan.

---

[44] Id. at 237.

[45] RP (Apr. 26, 2016) at 399.

[46] Id. at 400.

[47] Id. at 409.

Aamer said Youssef sent her highly detailed e-mails of his activities with H.Y. and expected her to do the same. She noted

all the logs he has created, and visitation logs and schedules that he asked me to also put in my time [and] what I did with [H.Y.] parenting, what time I changed her diaper, what time she slept, what time she ate, and to me this just showed me how he's just focused on actually observing and scheduling and writing down about his daughter more than actually just enjoying the time with his daughter.[48]

Youssef's father testified and disagreed with Aamer's descriptions of certain incidents and Youssef's behavior.

Jan Burnham, the instructor for a class that Youssef and H.Y. attended, described Youssef as a shy but active participant in the class. He socialized well with the mostly female adults in the class. When asked if Youssef seemed "hyperfocused on his child as compared to other parents," Burnham said, "Not at all."[49]

Debbie McBrayer testified that she supervised Youssef's student "service learning" in early childhood classrooms over a three-month period.[50] She described his interactions with children as "enthusiastic" and "very positive."[51]

Youssef testified that Dr. Hedrick's report did not treat him and Aamer equally. He believed the inequality was a result of Dr. Hedrick's refusal to contact collateral sources that would have contradicted Aamer's versions of events. He admitted recording the exchanges of H.Y. but said he did so on the advice of counsel. He denied recording the rental car employee on his honeymoon and denied most of Aamer's

---

[48] Id. at 362.

[49] RP (Apr. 27, 2016) at 602.

[50] Id. at 619.

[51] Id. at 620.

allegations, including the allegation that he forcefully grabbed her and forced a kiss on her. He also disagreed with Dr. Hedrick's descriptions and interpretations of his marriages. He conceded sending Aamer detailed post-visit emails about H.Y.'s diaper changes, feedings, etcetera, but said they were a response to Aamer's complaints that he wasn't changing H.Y. enough.

In closing argument, Youssef's counsel argued that "overmagnification of minor issues in the father and undermagnification of issues with the mother demonstrates bias and failure to consider contradictory evidence."[52] Counsel proposed a parenting plan with a brief transition period to overnights and 50/50 parenting.

The court found Dr. Hedrick's report "complete and reliable" and incorporated most of her recommendations in its parenting plan.[53] The plan required Youssef to obtain an evaluation and six months of counseling. The court intended the evaluation and counseling "to assist the father to develop long-term methods, expectations and attitudes that will lead to positive cooperation with the mother concerning the child and to develop similarly positive means in his own parenting."[54] The court rejected Dr. Hedrick's recommended one-year delay on Youssef's overnights with H.Y., ruling instead that overnights could begin after as little as three months of counseling.[55]

Youssef appeals.

---

[52] RP (Apr. 28, 2016) at 827.

[53] CP at 787.

[54] Id.

[55] Under the court's ruling, the three- and six-month counseling periods could be shorter or longer depending on the counselor's recommendation.

## ANALYSIS

Trial courts have broad discretion in adopting parenting plans and their decisions will not be disturbed absent an abuse of that discretion.[56] Appellate courts "are reluctant to disturb a child custody disposition because of the trial court's unique opportunity to personally observe the parties."[57] "The emotional and financial interests affected by such decisions are best served by finality. The spouse who challenges such decisions bears the heavy burden of showing a manifest abuse of discretion on the part of the trial court."[58] We review findings of fact for substantial evidence.[59] We review conclusions of law to determine whether the findings of fact support the conclusions.[60]

### Dr. Hedrick's Report

Youssef first challenges the court's reliance on Dr. Hedrick's report. Pointing to his experts' criticisms of the report, Youssef challenges the court's finding that the report was complete and reliable and contends the court's reliance on the report was an abuse of discretion. For the reasons set forth below, we disagree.

Trial courts have wide latitude in determining the weight to give expert opinions.[61] A court may "reject expert testimony in whole or in part in accordance with its views as

---

[56] In re Marriage of Littlefield, 133 Wn.2d 39, 46, 51-52, 940 P.2d 1362 (1997); In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012).

[57] In re Marriage of Murray, 28 Wn. App. 187, 189, 622 P.2d 1288 (1981).

[58] In re Marriage of Kim, 179 Wn. App. 232, 240, 317 P.3d 555 (2014).

[59] In re Marriage of McDole, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993).

[60] In re Marriage of Myers, 123 Wn. App. 889, 893, 99 P.3d 398 (2004).

[61] In re Marriage of Sedlock, 69 Wn. App. 484, 491, 849 P.2d 1243 (1993).

14

to the persuasive character of that evidence."[62] Appellate courts defer to the trial court's determination of the weight and persuasiveness of conflicting expert opinions,[63] and we will sustain the court's findings if they are within the range of the expert testimony.[64] Challenges to the reliability or adequacy of an expert opinion generally go to the weight or, in some cases, the admissibility of the opinion.[65]

In this case, Youssef does not contend Dr. Hedrick's report was inadmissible. Rather, he principally argues that, contrary to the court's finding, the report was incomplete and/or unreliable. As noted above, however, such challenges go to the weight of Dr. Hedrick's opinion. Because we defer to the trial court's assessment of the weight to give that opinion, Youssef's challenges to the reliability and completeness of

---

[62] Brewer v. Copeland, 86 Wn.2d 58, 74, 542 P.2d 445 (1975); Grp. Health Co-op. of Puget Sound, Inc. v. State Through Dep't of Revenue, 106 Wn. 2d 391, 399, 722 P.2d 787 (1986).

[63] State v. Monaghan, 166 Wn. App. 521, 534, 270 P.3d 616, 622 (2012), as amended Feb. 28, 2012.

[64] See In re Marriage of Harrington, 85 Wn. App. 613, 637, 935 P.2d 1357 (1997); Sedlock, 69 Wn. App. at 490.

[65] Cf. Katare, 175 Wn.2d at 39 (fact that expert did not conduct personal evaluation of the subject went to the weight of his testimony, not its admissibility); Raum v. City of Bellevue, 171 Wn. App. 124, 154, 286 P.3d 695 (2012) (fact that expert never physically examined subject went to weight of expert's testimony); Colley v. Peacehealth, 177 Wn. App. 717, 731, 312 P.3d 989 (2013) (expert testimony need not be flawless to be admissible; objections to expert's methods and use of certain data went to weight of his testimony); State v. Copeland, 130 Wn.2d 244, 270-77, 922 P.2d 1304 (1996) (whether DNA lab failed to follow standards and controls and whether its studies were valid went to weight of evidence); State v. Gentry, 125 Wn.2d 570, 588, 888 P.2d 1105 (1995) ("whether the proper procedures were carried out, whether the lab notes were adequate, whether the number of amplifications conformed to the laboratory protocol, are questions regarding whether this particular test was properly conducted and hence go to the issue of weight, not admissibility."); State v. Leuluaialii, 118 Wn. App. 780, 788, 77 P.3d 1192 (2003) ("a dispute over the validity of particular procedures generally goes to the weight of the evidence"); State v. Peterson, 100 Wn.2d 788, 792, 674 P.2d 1251 (1984) ("any challenge to the reliability of the Breathalyzer reading goes to its weight").

15

the report fail. In any event, even if those challenges were within the scope of our review, they would not demonstrate an abuse of discretion.

In support of his claim that Dr. Hedrick's report is neither complete nor reliable, Youssef lists a number of alleged flaws in the report. He first contends, and one of his experts opined, that the report is too short by professional standards. Aamer correctly points out, however, that the court's order appointing Dr. Hedrick did not require a report of any particular length.[66] Nor does Youssef cite any authority to that effect. The court was thus free to reject or discount Youssef's experts' opinion regarding the length of the report.

Youssef next claims Dr. Hedrick declined to review relevant information or interview collateral contacts who witnessed his parenting and interactions with other adults. Dr. Hedrick explained, however, that she had "a lot of information . . . about [Youssef's] parenting in the documentation that he provided" and "saw no reason to jack up the costs of the evaluation" by considering additional collateral sources or information.[67] She testified that there is no minimum number of collaterals that an evaluator should contact, that she does not interview collaterals who have submitted extensive writings, and that some of the collateral sources in this case would have provided information about superficial relationships, as opposed to intimate, high-conflict relationships that would shed light on Youssef's ability to co-parent. Dr. Hedrick added that she "virtually never contact[s] the parents or close relations of the parties . . .

---

[66] The order appointing Dr. Hedrick required a report containing "factual information . . . concerning parenting arrangements for the child," "[a]ll issues relating to development of a parenting plan," and "recommendations and bases for those recommendations." Dr. Hedrick's report met these requirements.

[67] RP (Apr. 20, 2016) at 82.

because there's clearly an issue of bias."[68] When asked why she did not contact other imams or read other e-mails allegedly suggested by Youssef, Dr. Hedrick said she did not recall any reference to additional imams and would have read any e-mails Youssef provided.

Youssef and his experts criticize Dr. Hedrick's use and interpretation of certain psychological test results. They assert that the MMPI-RF and PAI tests she used have limited utility and that she failed to acknowledge their limits. Dr. Hedrick addressed most of those criticisms in her testimony. For example, she testified that, contrary to Dr. Rybicki's assertions, the PAI is an increasingly accepted test for custody evaluations. She responded similarly to Dr. Rybicki's criticism of the MMPI-2-RF test. Quoting an article about the test, she testified that it "remains a very useful instrument" and provides results that are useful "in determining custody and visitation issues."[69] Dr. Hedrick supported her opinions on the tests with "published, peer-reviewed articles."[70] Furthermore, she made the limitations of the test results clear in both her testimony and her report.[71]

---

[68] Id. at 84.

[69] Id. at 57.

[70] Id. at 66.

[71] For example, her report acknowledged that the "[p]sychological test results presented below are only hypotheses and should not be used by the reader of this report in isolation from other information in this matter. The interpretive statements are primarily computer generated, actuarial predictions based on the results of the tests. Personality test results reflect characteristics of persons who have provided test response patterns that are similar to those of the current individuals. Although the test results are presented in an affirmative manner, they are probabilistic in nature. Further, the reader should interpret these findings cautiously in that it is impossible to tell, from test results alone, if these personality patterns and deficits pre-existed the events in question or are the results or sequelae of the events. Therefore the reader should examine the test interpretation for general trends and put limited weight on any one

Dr. Hedrick also disagreed with the experts' opinion that she overreached or overpathologized in her analysis of Youssef's test results, stating, "I said that there were mild elevations on a couple of scales that were consistent with concerns I had about his interpersonal functioning. That is not overpathologizing."[72] She also explained why she reached different conclusions regarding Youssef's and Aamer's elevated test scores. Dr. Hedrick determined that Youssef's elevated test results were generally consistent with observations that she and others had made about him, while Aamer's results were generally contradicted by other evidence and observations.

Youssef next contends Dr. "Hedrick's recommendations omit data and lack any logical connection to the data."[73] Relying on his experts' opinions, he argues that delaying overnights is "unrelated to the data" and inconsistent with "current best practice models."[74] He claims "[p]ostponing overnights can dilute attachment and bonding" and argues "that the goal should be to balance the detriment to attachment, which can result from no overnights, with the need for stability, which can decrease with overnights."[75] He also contends Dr. Hedrick relied on outdated and debunked authority to support her recommendation to delay overnights.

---

specific statement. In the integration and presentation of the test data, where results were unclear or in conflict, I used my clinical judgment to select the most likely hypotheses for presentation here. The reader's task is to keep in mind the information available regarding these parties and utilize that to test whether these hypotheses are confirmed or dis-confirmed." CP at 807.

[72] RP (Apr. 20, 2016) at 67.

[73] App. Br. at 30-33.

[74] Id. at 31.

[75] Id. at 32.

Dr. Hedrick testified, however, that she was familiar with the latest research in the area of overnights and young children and that the issue involved "competing concerns" and was highly controversial.[76] She acknowledged that in the most recent research, there are "some concerns about that youngest group with overnights" and that it essentially comes down to a detriment/benefit analysis.[77] She testified that "what the research says is that beyond a certain level of contact, there is no correlation between absolute time or overnights. It's the quality of the parenting. So he has way over the amount [of contact] that you would be concerned about there being detriment to."[78] She also testified that the "[r]esearch is really clear that the amount of time that either parent spends with the child is not as important as the quality of their interaction with that child."[79] Dr. Hedrick maintained that a benefit-detriment analysis in this case weighed in favor of delaying Youssef's overnights.

Youssef also maintains that Dr. Hedrick should have included parenting inventories in her report. Dr. Wieder testified he could not "see any valid argument for eliminating or omitting those kinds of inventories based on the child's age."[80] But Dr. Hedrick simply disagreed, stating, "there are no really good parenting inventories, particularly when the child is this age. They just, you will do far better to get collateral

---

[76] RP (Apr. 20, 2016) at 131.

[77] Id.

[78] Id. at 128.

[79] Id. at 68.

[80] RP (Apr. 25, 2016) at 284.

19

information about parent functioning and observe the child and the parent themselves, than to use inventories for that."[81]

Youssef contends Dr. Hedrick's report on her home visits was inadequate. Pointing to Dr. Rybicki's testimony, he contends her "brief observation of each party" and "three short paragraphs about each party's parenting" were insufficient to support "an opinion relative to parenting plan restrictions or limitations."[82] Dr. Rybicki conceded, however, that he had no "trouble with the one-hour visit" Dr. Hedrick had while observing each parent's interactions with H.Y.[83] And though he criticized the length of the report's discussion of those visits, he acknowledged that the descriptions of the parents' interactions were both positive and "relatively equivalent."[84] Furthermore, the home visits were barely mentioned in the discussion portion of Dr. Hedrick's report and thus played a de minimis role in her recommendation.

Youssef and his experts criticize Dr. Hedrick's reliance on his credibility as a basis for her recommendations. They assert that a parent's credibility during evaluations does not necessarily mean the parent will not be a competent and effective parent. Dr. Hedrick, however, did not purport to draw any definitive link between the two and grounded her credibility concern in the co-parent's experience. She stated that "Youssef's minimization . . . is *apt* to interfere with co-parenting in that [Aamer] perceives him as potentially not being straightforward with her about [H.Y.].[85] She

---

[81] RP (Apr. 20, 2016) at 66.

[82] Appellant's Br. at 29-30.

[83] RP (Apr. 26, 2016) at 420.

[84] Id.

[85] CP at 812 (emphasis added).

20

raises a concern that he will not tell her relevant information if he believes it *reflects badly on him or on his time* with [H.Y.]."[86] Dr. Hedrick concluded that, barring some work on his minimizing, Youssef would "*likely* create a situation in where there is more and more distrust with [Aamer.]"[87]

Youssef claims that Dr. Hedrick failed to consider how both parents' cultural background could affect their self-reporting on psychological testing and how his cultural background could affect his presentation during interviews or observations. But as noted above, the report expressly acknowledged "the difficulties in evaluating across significant cultural and religious lines."[88] Dr. Hedrick also testified that she "careful[ly] considered cultural issues."[89] Significantly, Dr. Hedrick relied heavily on the observations of a person who shared the parents' cultural perspective, Imam Shaker Alsayed. She testified that the imam "had the best insight" into the cultural/religious aspects of Youssef's relationships with adult women.[90] Dr. Hedrick also expressly interpreted Aamer's test results in light of her Muslim beliefs and Dr. Hedrick's experience living for two years in a Muslim village in Africa.

In response to questions suggesting that Youssef's parenting deficiencies could simply be a manifestation of cultural differences, Dr. Hedrick stated that a person

> may choose to follow what's handed down traditionally . . . . [T]hat's their choice . . . . But that's not really the issue. The issue is that it's still having those skills, those interactional skills, the ability to empathize with someone else's position, to understand that, to resolve conflict, all of those

---

[86] Id. (emphasis added).

[87] Id. (emphasis added).

[88] CP at 810.

[89] RP (Apr. 20, 2016) at 58.

[90] Id. at 134.

skills come in without, it doesn't have to be just around dating. And it certainly plays into the co-parenting arrangement. And it certainly plays into any future marriages down the way.[91]

I don't think what [group marriage counselors are] modeling as a way of interacting would run counter to [Youssef's] religious directives. I think it's about skills and skills acquisition. And again, those are important in any context.[92]

When Youssef's counsel suggested that his failed marriages were not surprising or significant given the Muslim prohibition on dating, Dr. Hedrick said, "Well, not all Muslim men go through three divorces after very short marriages."[93] The record demonstrates Dr. Hedrick's awareness of and sensitivity to cultural issues in this case.

Youssef next contends the report suffers from "confirmatory bias," which his expert defined as "the tendency to . . . selectively hear and attend the information that fits a previously held hypotheses."[94] Youssef points to the other alleged deficiencies in Dr. Hedrick's report, discussed above, as evidence of her failure to guard against confirmatory bias. But as previously noted, Dr. Hedrick addressed most, if not all, of the alleged deficiencies in her testimony and explained why she took or did not take various actions in preparing her report. We defer to the trial court's decision regarding the weight and persuasiveness of conflicting expert testimony.

Citing In re Marriage of Black,[95] Youssef also argues that Dr. Hedrick's report and testimony demonstrate cultural bias and that he is entitled to a new parenting plan

---

[91] Id. at 109.

[92] Id. at 110.

[93] Id. at 115.

[94] RP (Apr. 26, 2016) at 409.

[95] __ Wn.2d __ 392 P.3d 1041 (2017)

entered by a different judge. Although this claim does not go to the weight or persuasiveness of the evidence, it also lacks merit because Black is inapposite.

In Black, the trial court impermissibly considered a parent's sexual orientation and relied on a report exhibiting bias based on sexual orientation in developing its parenting plan. The Black court held that bias "permeated the proceedings" and cast "doubt on the trial court's entire ruling."[96] Contrary to Youssef's assertions, nothing in this case shows the type of affirmative bias the court encountered in Black. There is no evidence that Dr. Hedrick was biased against Youssef because of his religion or culture. Her alleged omission of possible religious or cultural explanations for certain behaviors or data, or Youssef's claims that that she "failed to deal competently with cultural and religious issues" do not demonstrate bias.[97] This is especially true given the previously-mentioned evidence showing her awareness and consideration of the cultural issues in the case.[98] In addition, Dr. Hedrick's alleged failure to guard against confirmatory bias in her methodology is simply not the type of bias at issue in Black.

Viewing Dr. Hedrick's report in the context of her testimony and the entire record, we cannot say the court abused its broad discretion in implicitly rejecting the experts' challenges to the reliability and completeness of Dr. Hedrick's report and in adopting, in

---

[96] Black, slip op at 26.

[97] Appellant's Reply Br. at 12.

[98] For the same reasons, and because Youssef raises the issue for the first time in his reply brief, we reject his claim that the trial court violated the appearance of fairness doctrine.

part, the report's recommendations.[99] In reaching that conclusion, we bear in mind our State Supreme Court's admonition that

> parenting plans are individualized decisions that depend upon a wide variety of factors . . . . *The combination of relevant factors and their comparative weight are certain to be different in every case, and no rule of general applicability could be effectively constructed. The very nature of a trial court makes it better suited than an appellate court to weigh these varied factors on a case-by-case basis.*[100]

### *Failure to Address RCW 26.09.187*

Youssef argues alternatively that the parenting plan must be reversed because the record fails to demonstrate that the trial court considered the factors listed in RCW 26.09.187(3). That statute provides in part that a court ordering a parenting plan "shall consider" the factors listed in the statute.[101] The court need not enter specific

---

[99] We note that the court significantly reduced Dr. Hedrick's recommended delay for Youssef's overnights from one year to three months.

[100] (Emphasis added); Parentage of Jannot, 149 Wn.2d 123, 127, 65 P.3d 664 (2003), as amended Apr. 30, 2003.

[101] RCW 26.09.187(3) provides in pertinent part:

(a) . . . Where the limitations of RCW 26.09.191 are not dispositive of the child's residential schedule, the court shall consider the following factors:

(i) The relative strength, nature, and stability of the child's relationship with each parent;

(ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;

(iii) Each parent's past and potential for future performance of parenting functions as defined in *RCW 26.09.004(3), including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;

(iv) The emotional needs and developmental level of the child;

(v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;

(vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and

findings on the factors, however, so long as "the record indicates substantial evidence was presented on the statutory factors thus making them available for consideration by the trial court and for review by an appellate court."[102] "In the absence of evidence to the contrary, we assume the trial court discharged its duty and considered all evidence before it."[103]

Here, the only statutory factors in serious dispute were "each parent's past and potential for future performance of parenting functions" and the "emotional needs and developmental level of the child."[104] The record contains substantial evidence relating to these factors, and counsel brought the statutory factors to the court's attention in a trial brief and closing argument. The record sufficiently demonstrates the court's consideration of the statutory factors.[105]

---

(vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.

Factor (i) shall be given the greatest weight.

[102] In re Marriage of Croley, 91 Wn.2d 288, 291-92, 588 P.2d 738 (1978).

[103] Id. at 291.

[104] RCW 26.09.187(3)(a)(iii),(iv). The other factors were essentially undisputed. Both parents acknowledged H.Y.'s strong relationship with each parent; there was no evidence as to any other significant adults in her life; the parents each expressed their parenting plan preferences and testified to the flexibility of their respective employment schedules.

[105] See Marriage of Shui & Rose, 132 Wn. App. 568, 591, 125 P.3d 180 (2005) ("While the trial court did not explicitly address every factor set forth in RCW 26.09.187(3)(a) in its findings of fact and conclusion of law, a review of Waldroup's report reveals that it encompasses the relevant factors; furthermore, it is evident that both Waldroup and the trial court gave the most weight to the first statutory factor, as is required by the statute.")

*Parenting Plan Provisions*

Youssef contends the parenting plan "is untenable" and an abuse of discretion for several reasons.[106] First, he argues there is no logical connection between any parenting deficiencies found by the court and delaying his overnights with H.Y. Because Youssef is now receiving overnights, this issue appears to be moot. In any case, considering Dr. Hedrick's concerns with Youssef's hyperfocused, project-oriented approach to H.Y. and the effect of that behavior on his interactions with H.Y., the court could tenably conclude that Youssef needed to improve "his ability to relate empathically to her needs before commencing overnight contact."[107]

Youssef also argues that the parenting plan appears to switch to a 'school schedule'" when H.Y. turns three, at which point H.Y. "will go for a week without [visitation]."[108] But it is clear from the court's repeated use of the words "school" and "school age," and Aamer appears to concede, that the "school schedule" begins when H.Y. is enrolled in kindergarten, not when she turns three.

Youssef also claims that the parenting plan fails to address moving toward a 50/50 schedule as Youssef proposed and fails to explain why the court awarded Aamer sole decision-making on school and healthcare, allocated Muslim holidays according to who has H.Y. on those days under the residential schedule, and decided to require judicial dispute resolution instead of mediation. Youssef cites no authority requiring the court to explain why it rejected Youssef's request or why it made the decisions it did

---

[106] Appellant's Reply Br. at 22.

[107] CP at 813.

[108] Appellant's Br. at 47.

regarding sole decision making, holidays, and dispute resolution. Youssef fails to demonstrate that these decisions were beyond the court's broad discretion.

Last, Youssef contends the court "erred in requiring written consent from the other parent to travel outside the state with H.[Y.]" because "parents enjoy a fundamental right to travel interstate."[109] He argues that "[t]he trial court cannot limit this fundamental right absent a showing of harm" and that "[t]here is none."[110] But contrary to Youssef's assertions, *his* right to travel is not restricted; rather, the restriction is on either parent removing H.Y. from the state of Washington.[111] "The constitutional rights of children may be treated differently than those of adults because of the peculiar vulnerability of children, their inability to make informed, mature, and critical decisions, and the importance of the parental role in child rearing."[112] Youssef fails to demonstrate an abuse of discretion.

### Attorney's Fees On Appeal

Aamer requests attorney's fees on appeal under RCW 26.09.140. That statute authorizes an award of fees based on the relative resources of the parties and the merits of their positions on appeal.[113] Having reviewed the parties' financial affidavits and the merits of the appeal and considering the trial court's award of roughly half of her

---

[109] Appellant's Br. at 48.

[110] Appellant's Br. at 48-49.

[111] The parenting plan states, "Neither father nor mother shall not remove the child from the [s]tate of Washington without the other parent's written consent." CP at 793.

[112] Momb v. Ragone, 132 Wn. App. 70, 82, 130 P.3d 406 (2006).

[113] In re Marriage of Leslie, 90 Wn. App. 796, 807, 954 P.2d 330 (1998).

fees and costs below, we award Aamer half of her reasonable attorney's fees and all of her costs on appeal, subject to her compliance with RAP 18.1.

Affirmed.

WE CONCUR: