[No. 28958-3-III.   Division Three.   February 7, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. CORY JAMES MONAGHAN, *Appellant*.

524

*David L. Donnan* and *Gregory C. Link* (of *Washington Appellate Project*), for appellant.

*Michael G. Sandona, Prosecuting Attorney*, and *Robert M. McKenna, Attorney General*, and *John C. Hillman, Assistant*, for respondent.

¶1 KULIK, C.J. — Cory Monaghan killed his friend, Jeremy Karavias, by shooting him, breaking his neck, stabbing him, and burning a trailer house down upon him. Mr. Monaghan was charged with first degree premeditated murder and first degree arson. The superior court denied his pretrial motion for acquittal on grounds of insanity, and the jury convicted him as charged, with a special verdict finding that he was armed with a firearm when he committed the murder. On appeal, he contends (1) he established with a preponderance of the evidence that he was insane due to a delusional disorder, (2) the State failed to prove premeditation beyond a reasonable doubt, (3) the trial court erred by refusing to instruct the jury that it must

unanimously agree on the act or acts that constituted the murder, and (4) the prosecutor engaged in misconduct in closing argument by misinforming the jury about the evidence it could consider.

¶2 The trial court did not err in finding that Mr. Monaghan did not have a mental disease or defect at the time he killed Mr. Karavias. We also conclude that an instruction based on *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), *overruled in part on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988) was not required because the continuing course of conduct exception to the *Petrich* instruction applies. We also reject Mr. Monaghan's other assertions of error. We affirm the convictions.

## FACTS

¶3 On Christmas Eve in 2005, Mr. Monaghan's young daughter died of cancer. Family members credit this unfortunate event with causing Mr. Monaghan's subsequent depression and odd behavior. One aspect of this behavior was Mr. Monaghan's belief that a business rival was trying to ruin his tree-trimming business by sabotaging equipment and bugging his cellular telephone.

¶4 In October 2008, Mr. Monaghan and one of his employees went deer hunting. His employee, a young man named Jeremy Karavias, had been living with Mr. Monaghan and his family since July of that year and was considered a friend. Mr. Monaghan and Mr. Karavias stopped in Malo, Washington, on October 21, 2008, to visit Mr. Monaghan's uncle, Ron Wessel.

¶5 From the moment that Mr. Monaghan arrived unexpectedly, Mr. Wessel had a premonition of violence. Although he invited the two men into his home, Mr. Wessel felt uneasy and secretly armed himself with a handgun while they were there. He also called his two adult daughters, told them Mr. Monaghan was acting weird, and asked them to stop by.

¶6 Mr. Wessel's daughters later testified that Mr. Monaghan seemed on edge and "would just zone out" that night. Report of Proceedings (RP) at 128. He brought a loaded assault rifle and a handgun into his uncle's house and seemed uneasy when his cousin offered to unload and clean the rifle. During the evening, Mr. Monaghan read portions of the Bible or the Koran aloud and declared that it was time to suit up for battle now that the economy was crashing. That night, Mr. Monaghan slept on his uncle's couch, Mr. Karavias slept in Mr. Monaghan's truck, and Mr. Wessel slept with his gun close at hand.

¶7 The next morning, Mr. Monaghan read aloud passages from the Bible about slaying enemies. Then he asked his uncle where in the area he could hunt deer, and he and Mr. Karavias prepared to leave. From the couch, Mr. Wessel watched his nephew and Mr. Karavias standing by the front door, mumbling quietly to each other. Mr. Wessel could see only Mr. Karavias, who stood holding the assault rifle with the barrel pointed toward the floor.

¶8 Suddenly Mr. Wessel heard a shot and saw Mr. Karavias stagger backward, exclaiming, " 'Cory, Cory.' " RP at 1182. Mr. Wessel rushed over and asked, " 'What the F did you do.' " RP at 1183. Mr. Monaghan said, " 'He pointed a gun at me.' " RP at 1183. " 'Bull F-ing shit,' " responded Mr. Wessel, who had been watching Mr. Karavias and knew the statement was a lie. RP at 1184. Mr. Wessel called 911, handed the telephone to Mr. Monaghan, and grabbed a handgun from him. Mr. Monaghan told the 911 dispatcher, "There's been a terrible accident," and later, "the gun went off and he got shot." Tr. of Ex. 13, at 000610. After unloading and hiding the handgun, Mr. Wessel took back his telephone and talked to the dispatcher while Mr. Monaghan knelt by Mr. Karavias, who was squirming and moaning. The next time Mr. Wessel looked, he saw Mr. Monaghan down on the floor cradling Mr. Karavias's head. Mr. Monaghan braced his feet against the door, grabbed Mr. Karavias's head, and twisted until Mr. Wessel heard

" 'crack, crack, crack' " from Mr. Karavias's neck. RP at 1190. Mr. Karavias's feet twitched briefly and he stopped moving altogether. Mr. Monaghan then looked up at Mr. Wessel with a look of "ecstasy" on his face. RP at 1189.

¶9  Mr. Wessel ran from the room to get his gun and told the dispatcher, " 'He just broke that kid's neck.' " RP at 1191. When Mr. Wessel walked back to the living room, he saw that Mr. Monaghan had flipped Mr. Karavias over, lifted his shirt, and apparently was preparing to stab Mr. Karavias's abdomen with a hunting knife.[1]

¶10  Mr. Wessel ran from the house, hid in an outbuilding for awhile, and eventually drove away. He discovered police and border patrol officers gathered down the road from his house and warned them that Mr. Monaghan was armed. Over one hour after the incident occurred, the officers noticed that Mr. Wessel's trailer was on fire. A helicopter crew dispatched to the scene saw a figure run from the burning trailer and ordered him to stop. Mr. Monaghan, shirtless and covered with blood, complied with the order to lie down. He had a cloth wrapped around a wound in his left thigh. After Mr. Monaghan was arrested, an officer asked him if he was wounded and he responded that Mr. Karavias had stabbed him. The officers found a bloody sweatshirt, a Bible, and a lighter on the ground near him. Some of the blood on the sweatshirt and on Mr. Monaghan's body was Mr. Karavias's. A kitchen knife found next to Mr. Monaghan's burned pickup truck (parked near the trailer) was stained solely with Mr. Monaghan's blood.

¶11  During Mr. Monaghan's ambulance ride to the hospital, the medics treated two small stab wounds on his thigh and they noted that his moustache hairs were singed. A deputy later reported that Mr. Monaghan's head, eyebrows, hair, and hands were singed as though they had been flash-burned. Soon after he arrived at the hospital, Mr.

---

[1] Mr. Wessel testified that it looked like Mr. Monaghan was going to " 'gut' " Mr. Karavias. RP at 1191.

Monaghan became unresponsive and had to be intubated. Medical personnel were concerned that he was undergoing a psychotic episode. He was airlifted to Sacred Heart Medical Center in Spokane and was eventually revived. Two officers accompanied Mr. Monaghan to an X-ray examination room, where his restraints were removed. When the officers stepped behind a protective wall during the X-ray, Mr. Monaghan jumped from the table and attempted to open the door to leave the room. The officers had to wrestle him to the ground and reported that although he first looked enraged, he then changed his demeanor and said he was sorry.

¶12 Investigators found Mr. Karavias's charred remains in the burned debris of the trailer. Due to the intense heat of the fire, most of his tissue was gone and any bullet fragments had melted away. A forensic pathologist testified that as a result, he could not determine the specific cause of his death. Mr. Monaghan's pickup truck had burned to the ground. Wessel family members who moved the truck one week later found the burned remains of a hunting knife under the pickup truck.

¶13 The State charged Mr. Monaghan by amended information with first degree murder with a firearm sentencing enhancement and first degree arson. He entered a plea of not guilty by reason of insanity. Pretrial, he moved for acquittal on grounds of insanity. After a hearing, the trial court denied the motion for acquittal and entered written findings of fact and conclusions of law.

¶14 The jury found Mr. Monaghan guilty of the charges and found by special verdict that he was armed with a firearm when he committed the murder. He was sentenced to 407 months of confinement.

## ANALYSIS

¶15 *Insanity Defense.* Mr. Monaghan first assigns error to the trial court's denial of his motion for acquittal on

grounds of insanity. We review the court's decision by considering whether substantial evidence supports the challenged facts and whether these facts support the court's conclusion that Mr. Monaghan failed to prove insanity by a preponderance of the evidence. *State v. Sommerville*, 111 Wn.2d 524, 533-34, 760 P.2d 932 (1988). Substantial evidence exists if the record contains enough evidence to persuade a rational person of the truth of the declared premise. *Id.* at 534. When substantial evidence supports the trial court's challenged facts, those facts are binding on appeal. *State v. Klein*, 156 Wn.2d 102, 115, 124 P.3d 644 (2005).

¶16 Washington law presumes that a person is sane at the time the person commits a crime. *State v. Box*, 109 Wn.2d 320, 322, 745 P.2d 23 (1987). Thus, a defendant who claims the defense of insanity must carry the burden of showing by a preponderance of the evidence that he or she was insane at the time of the offense. RCW 10.77.080. Not all who are "deranged" may raise the insanity defense because "legal insanity has a different meaning and a different purpose than the concept of medical insanity." *State v. Crenshaw*, 98 Wn.2d 789, 793, 659 P.2d 488 (1983). To prove legal insanity, the defendant must establish the elements of the *M'Naghten* rule, codified in RCW 9A.12.010. *M'Naghten's Case*, (1843) 8 Eng. Rep. 718 (H.L.) 722; 10 Clark & Fin. 200, 210, *cited in Klein*, 156 Wn.2d at 113. The defendant must show with a preponderance of the evidence that

(1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:

(a) He or she was unable to perceive the nature and quality of the act with which he or she is charged; or

(b) He or she was unable to tell right from wrong with reference to the particular act charged.

RCW 9A.12.010.[2]

¶17 *Mental Disease or Defect.* The trial court in written findings of fact found that Mr. Monaghan did not have a mental disease or defect. Sufficient evidence supports these findings.

¶18 Mr. Monaghan presented the testimony and written report of Dr. Vincent Gollogly, a clinical psychologist, who reviewed police and medical reports and interviewed Mr. Monaghan over the course of two days in September 2009. Dr. Gollogly concluded from this information and from psychological evaluation tests that Mr. Monaghan exhibited the mental diseases of delusional disorder and paranoid personality disorder. In Dr. Gollogly's opinion, Mr. Monaghan had suffered a fixed delusion since 2004 that a business rival was out to ruin his business and harm him. This mental disease, Dr. Gollogly opined, caused such extreme emotional turmoil that Mr. Monaghan could not appreciate the nature and quality of his actions and could not distinguish between right and wrong on the day of the incident. Specifically, Dr. Gollogly concluded that Mr. Monaghan "had developed a maladaptive pattern of excessive paranoia and suspicion about others, even those that were close friends and relatives." Clerk's Papers (CP) at 130.

¶19 Testimony from Mr. Monaghan's father, his brother, and former co-workers supported the reports that Mr. Monaghan believed the business rival was attempting to harm him and his business. Additional testimony estab-

---

[2] RCW 9A.12.010 was amended in 2011 to make it gender neutral. Laws of 2011, ch. 336, § 353.

lished that Mr. Monaghan had been acting "weird"[3] and "on edge"[4] just before the murder.

¶20 In response, the State presented the testimony of Dr. Trevor Travers, a clinical psychologist, and Dr. William Grant, a forensic psychiatrist. These medical experts interviewed Mr. Monaghan in July 2009 during his 15-day, court-ordered inpatient evaluation and again after Mr. Monaghan had been transferred back to jail. They also reviewed police and medical records and telephone conversations between Mr. Monaghan and family members recorded while he was in jail.

¶21 According to Dr. Travers, a mental disease is a severe illness that distorts the perception of reality to the extent that the person is psychotic. He noted that in 25 hours of telephone conversations, Mr. Monaghan showed organized, task-oriented thinking with no signs of psychosis. Additionally, at the time of the murder and arson, Mr. Monaghan did not exhibit paranoia or describe any hallucinations or delusions regarding his victim. Dr. Travers stated that Mr. Monaghan exhibited symptoms of a paranoid personality disorder and "magical thinking,"[5] not psychosis, when he was at Eastern State Hospital. And Dr. Travers indicated that anxiety disorders, such as the paranoid personality disorder, are not considered to be mental diseases in the psychological community.

¶22 Dr. Grant testified that a delusional disorder is a major mental illness, but that the records, tests, and interviews did not show that Mr. Monaghan had a delusional disorder. A delusional person is extremely tenacious in his delusions, he asserted, and Mr. Monaghan could be talked out of his delusions. For instance, although Mr. Monaghan claimed that the business competitor was tracking him through his cellular telephone, Mr. Monaghan explained

---

[3] RP at 43.

[4] RP at 188.

[5] RP at 691-92.

that he kept using his telephone because he had business contacts on it. Then, when Mr. Monaghan got a new cellular telephone, he was satisfied that he could not be tracked. Dr. Grant insisted that a genuinely paranoid, delusional person would not be so easily dissuaded from his delusion.

¶23 Mr. Monaghan argues that persistent adherence to a delusion is not one of the diagnostic criteria for a delusional disorder recognized in the American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th rev. ed. 2000) (DSM-IV-TR). While persistent adherence to the delusion is not included in the diagnostic criteria for the disorder, the DSM-IV-TR does recognize the "sustained delusional beliefs" that are characteristic of this disorder. DSM-IV-TR at 328. In its introduction, the DSM-IV-TR explains that "[t]he specific diagnostic criteria included in DSM-IV are meant to serve as guidelines to be informed by clinical judgment and are not meant to be used in a cookbook fashion." *Id.* at xxxii. Washington courts recognize that the DSM-IV-TR is an evolving, imperfect document that should not be treated as sacrosanct. *Klein*, 156 Wn.2d at 117 (quoting *In re Pers. Restraint of Young*, 122 Wn.2d 1, 28, 857 P.2d 989 (1993)). The trial court properly considered the DSM-IV-TR and the experience and training of all of the expert witnesses when it determined the credibility and weight to be given to the evidence. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

¶24 Mr. Monaghan also contends the trial court based its decision on psychologically indefensible beliefs that a delusional disorder is not a mental disease. The trial court in its oral ruling noted that the experts had engaged in a "philosophical discussion about whether a personality disorder can be a mental disease or defect"[6] and suggested that the legislature probably did not intend that personality disorders (such as paranoid personality disorder) should be the basis for an insanity defense. The court never stated that a

---

[6] RP at 867.

delusional disorder is a personality disorder. But, ultimately, the trial court concluded that Mr. Monaghan's expert failed to overcome the State's experts' opinions that Mr. Monaghan did not have a delusional disorder or any other mental defect or disease.

¶25 Finally, Dr. Grant and Dr. Travers testified that even if Mr. Monaghan suffered from a paranoid-type delusional disorder, the evidence did not show that his delusion involved anyone other than the business competitor. No statements by Mr. Monaghan ever indicated that he thought Mr. Karavias was connected to this business competitor or any other aspect of Mr. Monaghan's alleged paranoia.

¶26 We defer to the trial court's determination of the weight and persuasiveness of conflicting expert opinions. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004). Substantial evidence supports the trial court's finding that Mr. Monaghan did not suffer a mental disease or defect under RCW 9A.12.010 at the time of the offense.

¶27 *Inability To Perceive the Act or To Tell Right from Wrong.* The trial court also found that Mr. Monaghan was able to perceive the nature and quality of his acts and to tell right from wrong at the time he committed the charged offenses. These findings are supported by substantial evidence. For instance, it is undisputed that Mr. Monaghan knew he was shooting Mr. Karavias and would likely kill or seriously injure him. He showed an awareness that his acts were criminal when he lied to the 911 dispatcher by stating that there had been a terrible accident, when he set the fire with the apparent motive to destroy evidence, when he fled from the burning trailer, when he falsely accused Mr. Karavias of pointing the rifle at him and stabbing him, and when he tried to escape in the hospital.

¶28 The evidence supports the trial court's findings, which in turn support the conclusion that Mr. Monaghan failed to prove his insanity by a preponderance of the

evidence. Accordingly, the trial court properly denied his motion for acquittal on grounds of insanity.

¶29 *Premeditation.* Mr. Monaghan next contends there is insufficient evidence to support the premeditation element of the first degree murder charge. We review the evidence in the light most favorable to the State and ask whether any rational trier of fact could find sufficient evidence to support the essential elements of the crime beyond a reasonable doubt. *State v. Cross*, 156 Wn.2d 580, 627, 132 P.3d 80 (2006) (quoting *State v. Brown*, 132 Wn.2d 529, 551, 940 P.2d 546 (1997)); *State v. Hoffman*, 116 Wn.2d 51, 82, 804 P.2d 577 (1991).

¶30 As charged here, premeditation is an essential element of first degree murder. RCW 9A.32.030(1)(a). The premeditation required to support conviction "must involve more than a moment in point of time." RCW 9A.32.020(1). In other words, the State must show that the defendant decided to cause the victim's death after some period of reflection, however short. *State v. Gregory*, 158 Wn.2d 759, 817, 147 P.3d 1201 (2006) (quoting *Hoffman*, 116 Wn.2d at 82-83). "Premeditation may be proved by circumstantial evidence where inferences supporting premeditation are reasonable and the evidence is substantial." *Id.*

¶31 Mr. Monaghan makes the novel argument that because the State failed to prove which act—shooting, breaking the neck, or setting fire to the trailer—actually killed Mr. Karavias, the State failed to show that the act causing death was premeditated. Viewed in the light most favorable to the State's case, substantial evidence supports a rational juror's conclusion beyond a reasonable doubt that Mr. Monaghan committed each of the above violent acts. And multiple acts of violence support an inference of premeditation. *Cross*, 156 Wn.2d at 627; *Hoffman*, 116 Wn.2d at 84. Even if the evidence cannot conclusively establish that one particular act actually killed Mr. Karavias, a reasonable juror could find beyond a reasonable

doubt that Mr. Monaghan made the decision to kill his victim at least by the time he twisted Mr. Karavias's neck. Thus, there was sufficient evidence to support the element of premeditation.

¶32 Petrich *Instruction.* At the completion of the State's case, the trial court asked the parties whether a unanimity instruction was needed for the count of first degree murder. Mr. Monaghan later argued that a unanimity instruction based on *Petrich* was required because three separate and distinct acts of murder were alleged. The State responded that a *Petrich* instruction is not required when, as here, the defendant is charged with a continuing course of conduct within a short period of time. The trial court agreed with the State and declined the unanimity instruction. Mr. Monaghan contends the trial court erred by refusing to instruct the jury that it must unanimously agree on which criminal act was the basis for its verdict.

¶33 We review a trial court's refusal—based on factual reasons—to give an instruction for an abuse of discretion. *State v. Hunter*, 152 Wn. App. 30, 43, 216 P.3d 421 (2009); *State v. White*, 137 Wn. App. 227, 230, 152 P.3d 364 (2007). The refusal to give a jury instruction is a reversible error only if the instruction properly states the law and the evidence supports it. *State v. Ager*, 128 Wn.2d 85, 93, 904 P.2d 715 (1995).

¶34 A defendant may be convicted only when a unanimous jury decides that the defendant committed the criminal act charged in the information. *State v. Crane*, 116 Wn.2d 315, 324-25, 804 P.2d 10 (1991). Under *Petrich*, if the State presents evidence of multiple distinct acts that could form the basis of one charge, the State must tell the jury which act to rely on or the court must instruct the jury to agree on a specific act. *Petrich*, 101 Wn.2d at 572; *State v. Coleman*, 159 Wn.2d 509, 511, 150 P.3d 1126 (2007); *Crane*, 116 Wn.2d at 325. By requiring a unanimous verdict on one criminal act, the courts protect the defendant's constitutional right to a unanimous verdict based on an act that was

proved beyond a reasonable doubt. *Coleman*, 159 Wn.2d at 511-12; *Kitchen*, 110 Wn.2d at 409.

¶35 A *Petrich* unanimity instruction is not required, however, when the State presents evidence of multiple acts that indicate a "continuing course of conduct." *Crane*, 116 Wn.2d at 326; *State v. Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989); *State v. Love*, 80 Wn. App. 357, 361, 908 P.2d 395 (1996). "A continuing course of conduct requires an ongoing enterprise with a single objective." *Love*, 80 Wn. App. at 361. To determine whether multiple acts constitute a continuing course of conduct, we evaluate the facts in a commonsense manner. *Handran*, 113 Wn.2d at 17; *Love*, 80 Wn. App. at 361.

¶36 Washington courts have found a continuing course of conduct in cases where multiple acts of assault were committed with a single purpose against one victim in a short period of time. See cases cited in *Love*, 80 Wn. App. at 361-62. In *Crane*, the continuing course of conduct exception was applied to multiple acts of assault against a child victim over a two-hour time period, ending in the death of the child. *Crane*, 116 Wn.2d at 330. A unanimous jury verdict was not required on each incident of assault during the two-hour period; instead, the jury needed only to be unanimous that the *continuous conduct* occurred. *Id.*; *State v. York*, 152 Wn. App. 92, 96, 216 P.3d 436 (2009).

¶37 The evidence here, viewed in the light most favorable to the State, shows that Mr. Monaghan committed three potentially lethal acts against Mr. Karavias: he shot him in the chest at close range, he twisted Mr. Karavias's neck until he broke it, and he burned down the trailer with Mr. Karavias inside. Mr. Wessel—an eyewitness—testified that he observed Mr. Monaghan shoot Mr. Karavias and twist his neck until it snapped and Mr. Karavias went limp. Although Mr. Monaghan contends the State failed to prove that he started the fire, circumstantial evidence (no one else was near the trailer; Mr. Monaghan had singed hair, face, and hands; and he had a motive to conceal his crime)

could support a reasonable juror's conclusion beyond a reasonable doubt that Mr. Monaghan committed the arson. These acts occurred within a 90-minute period, and any rational juror could conclude that the acts had one objective: to kill Mr. Karavias. With this evidence, the continuing course of conduct exception applies and a *Petrich* unanimity instruction was not required. *Crane*, 116 Wn.2d at 330; *Love*, 80 Wn. App. at 361. The trial court did not abuse its discretion in refusing to instruct the jury that it must agree on one specific act to support the first degree murder charge. The trial court did not err in refusing to give a *Petrich* unanimity instruction.

¶38 *Prosecutorial Misconduct.* Finally, Mr. Monaghan contends the trial court erred in overruling his objection to a statement made by the prosecutor during rebuttal closing argument. The prosecutor discussed the medical records that were not entered into evidence but that were relied upon by Mr. Monaghan's expert witnesses in reaching their opinions on his sanity:

> Counsel—made reference to a lot of the records that the experts testified to. And that's something that you wouldn't normally hear in a criminal case. Normally all that stuff would be hearsay; you have to hear it, you know, directly from the horse's mouth. But when experts testify they're allowed to give opinions and they're allowed to tell you why they have the opinions, including relying on things that they've read. *But that's not really evidence; that's just things that they read . . . to support their opinions.*

RP at 2912 (emphasis added). Mr. Monaghan objected that the medical records are actual evidence and the court overruled, stating that it would allow leeway and let the jury decide for itself.

¶39 To prove prosecutorial misconduct, the defendant must establish that the prosecutor's comments were improper and prejudicial in the context of the record. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126

(2008)). Prejudice is proved by showing a substantial likelihood that the misconduct affected the verdict. *Id.* at 442-43 (quoting *Magers*, 164 Wn.2d at 191). Reversal is not required if the error could have been obviated by a curative instruction and the defendant did not request one. *Hoffman*, 116 Wn.2d at 93. We review a claim of prosecutorial misconduct for an abuse of discretion. *State v. Ish*, 170 Wn.2d 189, 195, 241 P.3d 389 (2010).

¶40 A prosecutor has wide latitude in closing argument to express reasonable inferences from the evidence and to comment on the credibility of witnesses. *Thorgerson*, 172 Wn.2d at 448. The prosecutor's statements of the law must be confined to the law set forth in the court's jury instructions. *State v. Davenport*, 100 Wn.2d 757, 760, 675 P.2d 1213 (1984). In this case, the jury was given jury instruction 8, which was based on 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 6.51, at 199 (3d ed. 2008), the standard for expert opinion testimony:

> A witness who has special training, education, or experience may be allowed to express an opinion in addition to giving testimony as to facts.
>
> You are not, however, required to accept his or her opinion. To determine the credibility and weight to be given to this type of evidence, you may consider, among other things, the education, training, experience, knowledge, and ability of the witness. You may also consider the reasons given for the opinion *and the sources of his or her information,* as well as considering the factors already given to you for evaluating the testimony of any other witness.

CP at 166 (emphasis added). This instruction emphasizes that the weight of an expert's opinion is judged in part by the education, experience, and factual data used by the expert to form that opinion. The prosecutor's challenged comments do not contradict the law of the instruction and merely cast doubt on the reliability of the information relied upon by the defense's expert witnesses.

¶41 On the other hand, the prosecutor may have erred by referring to the medical records as inadmissible hearsay. *See Thorgerson*, 172 Wn.2d at 445 (disapproving the prosecutor's reference to the hearsay rules and how they affect production of evidence at trial). ER 703 allows expert opinion testimony based on hearsay that would be otherwise inadmissible in evidence. *State v. Russell*, 125 Wn.2d 24, 74, 882 P.2d 747 (1994). But Mr. Monaghan shows no prejudice. Both the State's expert witnesses and the defense's expert witnesses based their opinions in part on medical records that were not entered into evidence at trial. The reference to those records as merely "things that they read" to support their expert opinions cuts both ways. RP at 2912. The court's instruction on expert testimony reduced any confusion raised by the prosecutor's remarks. Furthermore, contrary to Mr. Monaghan's assertion, it was his burden—not the State's—to propose a curative instruction. *Hoffman*, 116 Wn.2d at 93. Mr. Monaghan fails to show a substantial likelihood that the prosecutor's comments affected the jury's verdict.

¶42 The prosecutor's statement was not reversible misconduct.

¶43 *Conclusion.* We affirm the trial court's finding that Mr. Monaghan was not insane. We affirm that Mr. Monaghan acted with premeditation. We affirm that no *Petrich* instruction was required because Mr. Monaghan's actions were a continuous course of conduct. We conclude there was no prosecutorial misconduct. Therefore, we affirm the convictions.

SWEENEY and BROWN, JJ., concur.

Review denied at 174 Wn.2d 1014 (2012).