IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38530-2-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| WILLIAM WALTER BOST, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, A.C.J. — The State charged William Bost with murder in the first degree. He moved the trial court for acquittal by reason of insanity. After an evidentiary hearing, the trial court found that Mr. Bost committed the charged act of murder in the first degree, but acquitted him by reason of insanity. It then entered three findings, which taken together resulted in the court ordering Mr. Bost to be detained in a state mental hospital.

On appeal, Mr. Bost challenges the sufficiency of the evidence to support each of the three findings. Viewing the evidence in the light most favorable to the State, as we must, we affirm the first two findings. There probably is sufficient evidence to affirm the third, but for the reasons stated below, we vacate the third finding and remand for a hearing on that issue.

FACTS

Just after midnight on January 6, 2018, William Bost slowly drove his car into the back of a parked police cruiser with its emergency lights on that was blocking the road. The cruiser belonged to Spokane County Sherriff's Deputy Travis West, who had completed a driving under the influence arrest and was awaiting a tow truck. The deputy noticed that Mr. Bost's car did not have its headlights on and the windows were fogged up. The deputy approached the sedan with his gun drawn and noticed Mr. Bost in the driver's seat, holding a small dog.

Deputy West called for backup. Once Deputy Mitchell Othmer arrived, Deputy West approached the car and noticed Mr. Bost wearing only underwear and some sort of wrap on his foot. Mr. Bost was holding the dog in his lap and rambling incoherently while rocking back and forth. The deputies could only make out short statements through Mr. Bost's crying and screaming; one of these statements was that Mr. Bost's wife was dead and that his dog, Isabelle, "Izzy," did not mean to kill her. They thought Mr. Bost was having some kind of mental crisis and called for an ambulance. He was taken to the local hospital where he was evaluated for mental health issues.

In the meantime, detectives responded to Mr. Bost's home and found his wife, Jade Bost, dead and lying face down in a pool of blood on the kitchen floor. She had

2

been stabbed at least four to five times in the upper back and twice on the left the side of her head. She also had slicing cuts on her fingers and visible blunt force injuries to her mouth, nose, and chin. Inside the home, detectives found two knives used in the attack and eight firearms that Mr. Bost was not legally allowed to possess because of a 1989 first degree robbery conviction. The detectives also found a half consumed two-quart bottle of vodka on the kitchen counter above Ms. Bost's body.

At the hospital, Mr. Bost was evaluated for mental health issues, and a computed tomography (CT) scan was taken. His blood alcohol concentration was 0.12 approximately two hours after he struck the police cruiser. While at the hospital, Spokane Police Detective Randy Lesser read Mr. Bost his *Miranda*[1] rights. Mr. Bost responded, indicating that he did not understand why he was being read his rights if the officer whose car he struck was not hurt. Detective Lesser explained that reading rights was appropriate when he wanted to ask a person about a crime they might have committed. Mr. Bost indicated that he understood, and Detective Lesser read Mr. Bost his *Miranda* rights again. At that point, Mr. Bost requested an attorney.

Detective Lesser acknowledged Mr. Bost's request but remained in the room to prevent any potential violence against the doctors and nurses coming and going from the

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

room. He overheard Mr. Bost tell the treating physician he suffered from bipolar disorder and depression, he took antipsychotic medications, he drank every day and used marijuana, he had auditory and visual hallucinations, he had no thoughts of wanting to hurt others, and he did not know if he lived alone.

*Procedure*

The State charged Mr. Bost with one count of murder in the first degree and eight counts of unlawful possession of a firearm. Mr. Bost was later transferred from the local hospital to Spokane County Jail, then taken to Eastern State Hospital (ESH) for a competency evaluation.

a.      *ESH competency evaluation*

At ESH, Dr. W. Timm Frederickson examined Mr. Bost and diagnosed him with asymptomatic bipolar disorder (due to medication) and polysubstance abuse (alcohol, methamphetamine). Dr. Frederickson's initial impression was "[o]verall, [Mr. Bost's] insight, judgment, and impulse control are reduced at this point because of ongoing chronic mental illness and alcohol use disorder while he faces serious legal charges." Clerk's Papers (CP) at 22-23. Dr. Frederickson noted that preadmission paperwork indicated Mr. Bost was not aggressive at the jail and seemed stable. Dr. Frederickson opined that Mr. Bost was competent to proceed with the case and that an evaluation for

4

criminal responsibility should be considered.  He noted that Mr. Bost had not taken his prescribed medication on the night of the murder but opined that as long as he took medications as prescribed, he would not require evaluation by a designated crisis responder.

Later, at the request of defense counsel, the trial court appointed an independent expert, Dr. Richard Adler, to examine Mr. Bost and to provide an opinion whether he was insane at the time he killed his wife.  At the State's request, the trial court appointed Dr. Nathan Henry, a Department of Social and Health Services expert, to examine Mr. Bost and to provide a separate opinion on the issue of insanity.

> b.  *Motion for acquittal by reason of insanity*

Once the experts had completed their examinations and reports, Mr. Bost moved the trial court for a judgment of acquittal by reason of insanity.  The motion, the briefing, and the exhibits focused solely on the question of whether Mr. Bost, because of mental disease or defect, was able to perceive the nature and quality of his acts at the time he killed his wife.  Similarly, the State's response, focused only on those issues.  Neither submission discussed whether Mr. Bost might be a substantial danger to others if released; whether, if released, Mr. Bost presented a substantial likelihood of committing criminal acts jeopardizing public safety; or whether it was in Mr. Bost's and other's best

interest that he be placed in treatment less restrictive than detention in a state mental hospital. *See* RCW 10.77.040 (questions 3-5).

Prior to the hearing, Mr. Bost pleaded not guilty by reason of insanity to count 1, murder in the first degree. He pleaded guilty to counts 2 through 9, unlawful possession of a firearm in the first degree.

### c. *Evidence presented at hearing to acquit*

The trial court held a bench trial on the motion for acquittal. It considered the testimonies of the parties' experts, the investigating officers, and Mr. Bost's brother. In addition, it admitted numerous exhibits, including Dr. Adler's and Dr. Henry's written reports, medical records, and photographs of the crime scene. Because Mr. Bost challenges the sufficiency of the evidence, we set forth the evidence in the light most favorable to the State. To assist the reader's understanding, we organize it by subject matter, rather than by witness.[2]

---

[2] To ensure we set forth the facts in the light most favorable to the State, we have, almost verbatim, taken subsections i-viii from the State's thorough and accurate discussion of the evidence presented at the acquittal hearing.

6

### i. Substance abuse

Mr. Bost began using alcohol and cannabis as a teenager. By his late teens and early 20s, he used "'pretty [much] anything that came through town,'" including PCP (phencyclidine), hallucinogenic mushrooms, and LSD (lysergic acid diethylamide). CP at 310. He admitted he was an alcoholic by his mid-20s, and that he abused cocaine. He claimed he had a 10-year period of sobriety at some unspecified time (possibly between ages 30 and 40), but by his late 30s he drank alcohol regularly, at some point drinking between 60 and 90 beers per week until switching to hard alcohol. He began using methamphetamine in his 40s. He abused benzodiazepines he purchased online to the point that in approximately 2008, at roughly age 50, he overdosed on "bootleg" Valium. CP at 302. Also around that time, Mr. Bost reported drinking a minimum of 60 beers—with an alcohol content of 5.9 percent—per week.

Just prior to murdering his wife, at roughly age 60, Mr. Bost was discharged from Northwest Spine and Pain Medicine because he missed an appointment and violated the pain contract under which he received hydrocodone by twice testing positive for methamphetamine. Mr. Bost continued to use cannabis at that time and reported he thought the methamphetamine in his system must have been in cannabis he obtained from a friend. However, he also admitted to continued methamphetamine use. In addition, at

that time, Mr. Bost consumed a half gallon of hard alcohol every three days. The night of

the murder, Mr. Bost purchased vodka and the partially consumed bottle was found on the

kitchen counter, near Ms. Bost's body.

*ii.     Criminal history*

Aside from the recent murder of his wife and the unlawful possession of eight

firearms, Mr. Bost's criminal history includes convictions for first degree robbery and

attempt to elude in 1989. These offenses were alcohol and cocaine related. The robbery

resulted from Mr. Bost pointing a firearm at the clerk at a Zip Trip to obtain money to

purchase cocaine. Roughly 10 years later, while in his 40s, Mr. Bost was convicted of an

alcohol-related driving offense (his criminal history reflects a negligent driving

conviction in 2002).

*iii.     Substance use treatment*

Mr. Bost received chemical dependency treatment while serving one year in jail

for the 1989 first degree robbery and attempt to elude convictions. Following a charge of

physical control of a vehicle while under the influence, Mr. Bost received inpatient

chemical dependency treatment in 2002 to 2003 at Spokane Addiction Recovery Center

(SPARC), with outpatient follow-up treatment. Mr. Bost believes he also received

chemical dependency treatment after a negligent driving conviction, but it appears that

conviction may be the same as the physical control conviction just referenced, and the treatment may have been the treatment received at SPARC in 2002 to 2003.

All treatment was ultimately unsuccessful, because in 2008, Mr. Bost reported drinking six beers per night. Mr. Bost saw a chemical dependency counselor in 2009, but by 2010 he lost his job due, in part, to his drinking. He was diagnosed with alcohol, cannabis, and cocaine dependence. Mr. Bost declined formal treatment.

Mr. Bost also saw a psychiatrist six times in 2010 for his alcohol use. The psychiatrist recommended he attend Alcoholics Anonymous, but Mr. Bost did not do so. In 2012, Mr. Bost was referred for chemical dependency treatment. There is no evidence that Mr. Bost ever successfully completed chemical dependency treatment or stopped abusing multiple substances.

### iv. *Bipolar disorder diagnosis & treatment*

In 1998, Mr. Bost's doctor prescribed several antidepressants for mood, none of which had noticeable benefits. Mr. Bost was referred for a specialty mental health evaluation and started on Seroquel, a mood-stabilizing antipsychotic medication commonly used to treat bipolar disorder.

Kaiser Permanente records show Dr. David Grubb, a psychiatrist, diagnosed Mr. Bost with bipolar disorder, unspecified, sometime after first treating him in 2007. This

was not his primary diagnosis at that time. In 2008, Mr. Bost visited his primary care physician to obtain a refill of Seroquel. His dosage at that time was 200 mg.

In 2010, Mr. Bost saw a family practice provider who listed bipolar disorder as his primary diagnosis. By that visit, Mr. Bost's dosage of Seroquel had doubled to 400 mg. He was only 50 percent medication compliant at that time.

In 2012, Dr. Grubb concurred that bipolar disorder was the primary diagnosis and noted that the "Seroquel has kept [Mr. Bost] from getting angry or anxious, but has not been as helpful for the depression." Ex. D-142. Mr. Bost accepted his diagnosis. Dr. Grubb completed an Americans with Disabilities form requesting workplace shift accommodations, explaining that disruption to circadian rhythms "is an integral part of bipolar disorder" and that Mr. Bost had a "major risk of decompensating if he changes work shifts." Ex. D-142. Dr. Grubb also noted that Mr. Bost's alcohol use "remains problematic, of which he is well aware." Ex. D-142.

At some point, Mr. Bost discontinued his psychiatric medications. At the time he killed his wife, he had not been taking Seroquel or any other psychiatric medication for about two years. Mr. Bost reported he was having "'emotional outbursts'" around the time of the murder. CP at 354.

*v.*      *Psychiatric assessments*

Numerous psychiatric assessments were conducted following Mr. Bost's arrest.  In May 2018, as part of his competency evaluation at ESH, Mr. Bost completed the Minnesota Multiphasic Personality Inventory-2-Restructured Form (MMPI-2-RF).

The evaluator, Dr. W. Timm Frederickson, PhD, observed a possibility that Mr. Bost was overreporting symptoms but noted this can occur in individuals with genuine, severe psychopathology.  Notably, despite the charges, Mr. Bost self-reported a "below average level of aggressive behavior."  CP at 25.  Dr. Frederickson's overall impression from the assessment was that Mr. Bost's "insight, judgment, and impulse control [were] reduced . . . because of ongoing chronic mental illness and alcohol use disorder while he face[d] serious legal charges."  CP at 22-23.

Dr. Adler, the defense expert, administered a Personality Assessment Inventory (PAI) in 2020.  The PAI is a psychological test based on self-reports used to assess "personality and mental illness while providing insight into an evaluee's 'response style.'"  CP at 357.  The results reflected elevations on various scales that suggested a "'moderate to severe level of psychiatric distress and impairment,'" which, at the time of the evaluation, included problems with paranoia, psychotic symptoms, and possibly a tendency for impulsivity.  CP at 369.  While Mr. Bost's responses, including that he is

11

unassertive and struggles to stand up for himself, resulted in no elevation in aggressiveness, when risk and treatment scales were applied, they showed statistically relevant elevations in his violence potential index and Dr. Adler noted Mr. Bost's "behavior is likely to be reckless and he can be expected to entertain risks that are potentially dangerous to himself and to those around him." CP at 405.

Dr. Adler commented that Mr. Bost appeared motivated for treatment, but stated that the "nature of some of these problems suggests that treatment would be fairly challenging, with a difficult treatment process and the probability of reversals." CP at 406. He stated that if "treatment were to be considered" for Mr. Bost, "particular areas of attention or concern in the early stages of treatment" might include:

> He may have initial difficulty in placing trust in a treatment professional as part of his more general problems in close relationships.
>
> He may currently be too disorganized or feel too overwhelmed to be able to participate meaningfully in some forms of treatment.
>
> He is likely to have difficulty with the treatment professional as an authority figure, and he may react to the therapist in a hostile or derogatory manner.

CP at 406.

Dr. Henry, the State's expert, administered an updated Minnesota Multiphasic Personality Inventory-3 (MMPI-3) in 2021. The results again indicated inconsistency and a pattern of overreporting, which, though not necessarily indicative of malingering or

sufficient to invalidate the assessment, suggested the results be cautiously interpreted.

Mr. Bost reported emotional, thought, behavioral, and interpersonal dysfunction. He

endorsed suicidal ideation, antisocial behavior, juvenile conduct problems, substance use

and impulsivity, as well as interpersonal difficulties associated with social avoidance

behaviors. Mr. Bost reported that if sentenced to prison, he would seriously consider

suicide, but that if sentenced to the hospital, he felt there would be hope.

Dr. Henry concluded Mr. Bost did not suffer from bipolar disorder, noting the lack

of prior psychiatric hospitalizations and the lack of manic or hypomanic episodes in his

history. He also explained that Mr. Bost's history of significant substance abuse

complicated the diagnosis, noting the "effects of the substances Mr. Bost was using could

include symptoms even more severe than what he has reported. For example, it is not

uncommon for individuals to develop severe psychotic symptoms in the context of using

methamphetamine." CP at 314.

### vi. Neurocognitive disorder

Mr. Bost reported multiple past head traumas. During childhood, his brother threw

a rock at his head, and it fractured his skull. Mr. Bost reportedly had neurological

symptoms afterward, including tunnel vision and a feeling that his appendages were large,

swollen, and heavy. These symptoms resolved by age 20.

13

At some point, possibly in 1970 when he was roughly 12 years old or possibly by the point he was an adult, he crashed into a butte headfirst while wearing a helmet, broke his collarbone, and suffered a concussion.

In 2013, five years before he killed his wife, Mr. Bost was struck in the left temple area during a mugging. This blow fractured the left orbital area of his skull. Mr. Bost was scheduled for surgery to address this injury but no records indicate the surgery occurred. Shortly after this injury, Mr. Bost's brother noticed Mr. Bost changed, becoming reclusive and detached.

Due to this history of head trauma and his bizarre behavior the night he killed his wife, Mr. Bost underwent a quantitative electroencephalogram (QEEG) in August 2020 at Dr. Adler's request. Similar to an EKG (electrocardiogram), a QEEG measures the brain's electrical activity and digitally quantifies the results. It provides information about underlying brain function and whether damage has occurred. Though at the time the QEEG was administered Mr. Bost had been taking prescribed psychiatric medication on a regular basis and had not been consuming alcohol or illicit substances for a period of two years, the results of the test were "markedly abnormal." CP at 361. They showed impairment in the limbic lobe, the frontal lobes, and in the connections between them.

14

As a general matter, the limbic lobe is the seat of primal impulses, emotions, and urges. The frontal lobes control "the ability for judgment, discernment, problem solving, planning, [and] weighing options," and "puts the brakes on" the impulses that originate in the limbic lobe. Rep. of Proc. (Mar. 18, Mar. 30-Sept. 1, 2021) (RP) at 133-34, 147. The connectivity between these two regions of the brain are, therefore, extremely important to an individual's "control over themselves, their ability to discern choices, their ability to control impulses, [and] their ability to understand and integrate emotions . . . ." RP at 147.

Mr. Bost's neurological testing showed abnormalities in the frontal lobe, specifically in Brodmann Areas 9, 24, 25, and 32. Brodmann Area 9 is "extremely important because it is part of . . . the dorsal lateral prefrontal cortex." RP at 134. The dorsal lateral prefrontal cortex is the latest part of the human brain to fully develop. Lack of full maturation in this region of the brain explains why otherwise nice, young individuals "do un-Godly stupid things that nobody, including themselves, can make sense of," and was the reason the United States Supreme Court found the death penalty for juveniles unconstitutional. RP at 134-35.

Brodmann Areas 24, 25, and 32 are located in close proximity to each other and are all critical to frontal lobe function. Brodmann Area 25 is associated with chronic

treatment-resistant depression.  Brodmann Area 32 is particularly important because it is considered the seat of free will, integral to choosing, volition, and the ability to self-direct.

After reviewing these records, Dr. Adler diagnosed Mr. Bost with traumatic brain injury with a severity at the high end of mild.  He concluded that Mr. Bost's brain was not functioning well and that in terms of executive function, mirror neurons (which allow someone to understand what another person is feeling and thinking), and mood, he was "doing as bad as you can do."  RP at 146.  Notably, this poor brain function was not measured at the time Mr. Bost killed his wife.  This reflected Mr. Bost's brain function years after the murder, following a sustained period of regularly taking psychiatric medications and abstinence from alcohol and other substances.

### vii.    *Interpersonal conflict*

Mr. Bost's relationship with his wife was troubled.  Though charges were not filed, records demonstrate that in 2007, Mr. Bost pushed Ms. Bost while he was intoxicated.

In 2018, in the days leading up to her death, Ms. Bost began keeping a diary to document their difficult relationship.  She wrote: "I have decided once again to keep a journal.  I hope to defuse some of my anxiety and to record for myself what I think and

feel." Ex. P-34. On January 1, five days before her death, she wrote: "We have argued for 2 weeks it seems. [Will] hates me, calls me cunt and does not see how much I love him. I don't think I can take much more. I'm depressed and in a constant state of worry and anxiety. . . . Right now [Will] sleeps most of the time." Ex. P-34.

On January 2, Ms. Bost wrote:

This has been a truly horrifying day. I get Will up a little after noon. He was telling me about a dream and then it all went haywire. He said horrible mean things to me. He did take me to Walmart but after we fought. I can't take this abuse. He wants someone else not me.

Ex. P-34.

On January 3, just two days before her death, Ms. Bost wrote her final entry: "Things were better today. Will said he was sorry, but didn't say sorry for what. He seemed strange all day almost out of it. Some things I just don't get." Ex. P-34.

### viii.  Dr. Adler's conclusions

Dr. Adler, the defense expert, concluded Mr. Bost was insane at the time he murdered his wife due to the co-occurrence of bipolar disorder and undiagnosed untreated neurocognitive disorder associated with traumatic brain injury. Dr. Adler concluded that *not only was Mr. Bost "markedly psychiatrically afflicted before the tragic events," but that at the time of trial, under the best of circumstances including regularly taking medication and not using substances, Mr. Bost was still "extremely neuropsychiatrically*

17

*afflicted.*"  RP at 177 (emphasis added).  *He found Mr. Bost's bipolar disorder was only in "partial remission due to the treatment he [was] receiving.*"  CP at 370 (emphasis added).

### d.  Trial court ruling

After considering the above, the trial court concluded Mr. Bost suffered from bipolar disorder with psychotic features and neurocognitive disorder associated with traumatic brain injury, which affected him to such an extent that "he was unable to appreciate and perceive the nature and quality of his actions at the time of the offense." CP at 591.  Accordingly, the court granted Mr. Bost's motion for acquittal on the basis of insanity.

As noted previously, neither party anticipated addressing any issue other than Mr. Bost's insanity at the time of the motion hearing.  Mr. Bost did not request that the court find he was not dangerous or that he be released on a less restrictive alternative in his motion for acquittal.  The parties did not address these issues at the motion hearing, and Dr. Adler even admitted he had not been retained to give his opinion about whether Mr. Bost presented a substantial danger to others.

However, although the parties did not specifically address those issues, the court

determined sufficient evidence had been presented to support the following three

findings:

> 66.   At this time, the Court finds that Mr. Bost is a substantial danger to other persons unless kept under further control by the Court or an institution.
> 67.   At this time, the Court finds that the defendant does present a substantial likelihood of committing felonious criminal acts jeopardizing public safety or security unless kept under further control by the Court or other persons or institutions.
> 4.[3]   At this time, it is not in the best interests of the defendant and others that the defendant be placed in treatment that is less restrictive than detention in a state mental hospital.

CP at 591-92.

Consequently, the court committed Mr. Bost to ESH "until such time as an

appropriate less restrictive placement is available." CP at 591.

Mr. Bost timely appealed.

ANALYSIS

Mr. Bost contends the State presented insufficient evidence to support the three

findings quoted above. He asks that he be immediately released from ESH.

---

[3] Conclusion of law 4 is actually a finding of fact. Mr. Bost correctly recognizes this by assigning error to it, in addition to the other two quoted findings.

19

*Standard of review*

We review challenged findings of fact from a trial court's decision on a motion for acquittal by reason of insanity for substantial evidence. *State v. Monaghan*, 166 Wn. App. 521, 530, 270 P.3d 616 (2012). Substantial evidence exists if the record contains enough evidence to persuade a rational person of the truth of the declared premise. *Id.* When substantial evidence supports the trial court's challenged facts, those facts are binding on appeal. *Id.*

In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992); *State v. Drum*, 168 Wn.2d 23, 35, 225 P.3d 237 (2010). These inferences "must be drawn in favor of the State and interpreted most strongly against the defendant." *Salinas*, 119 Wn.2d at 201. Further, we defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

*Motions for acquittal by reason of insanity*

By filing a motion for acquittal by reason of insanity, the defendant admits to having committed the act in question and asks the court to make necessary findings to acquit them on the grounds of a mental disease or defect excluding responsibility. *State v.*

20

*Jones*, 84 Wn.2d 823, 832-33, 529 P.2d 1040 (1974). If the provision is invoked, the defendant waives the right to have a jury decide whether they committed the act as charged. *Id.*

At the hearing on this motion, the defendant has the burden of proving by a preponderance of the evidence that he or she was insane at the time of the charged crime. RCW 10.77.080. If the court finds that the defendant should be acquitted by reason of insanity, "it shall enter specific findings in substantially the same form as set forth in RCW 10.77.040." *Id.* Here, the trial court acquitted Mr. Bost by finding he was insane at the time he murdered his wife. We now turn to RCW 10.77.040 to determine what specific findings the trial court was required to enter.

RCW 10.77.040 sets forth five specific questions a jury must answer by special verdict when a defendant asserts he or she is not guilty by reason of insanity. The first two questions concern whether the defendant committed the charged act and whether the defendant was insane at the time of the act. The first question was answered prior to the hearing because by statute, the defendant is required to admit that they committed the charged act. The second question was answered in the affirmative by the trial court and is not appealed by the State.

The three remaining questions are: (1) Is the defendant a substantial danger to other persons unless kept under further control by the court or other persons or institutions? (2) Does the defendant present a substantial likelihood of committing criminal acts jeopardizing public safety or security unless kept under further control by the court or other persons or institutions? (3) Is it in the best interests of the defendant and others that the defendant be placed in treatment that is less restrictive than detention in a state mental hospital? *See* RCW 10.77.040.

Here, the trial court answered these three questions affirmatively. We address these findings to determine whether they are supported by sufficient evidence.

> 1.      *If released, Mr. Bost poses a substantial danger to others and a substantial likelihood of committing criminal acts jeopardizing public safety*

Mr. Bost has a long history of alcohol and drug abuse and treatment failures, bi-polar disorder with psychotic features, and a neurocognitive disorder associated with one or more traumatic brain injuries. This history has contributed to past criminal acts—first degree robbery, two alcohol and/or drug related driving convictions and, most notably, the murder of his wife.

Although there is no presumption of continuing dangerousness, evidence that his condition has not significantly improved is highly probative of future dangerousness.

When a defendant has been acquitted of murder, thus proving his dangerousness at the time,

> unless there is clear, ample, and conclusive evidence that his mental
> condition has undergone a radical change toward a normal condition since
> that time, the trial judge should not hesitate to find him "manifestly
> dangerous" within the meaning of the statute—unless, of course, his
> physical condition, by reason of sickness, disease, or otherwise, should have
> rendered him absolutely incapable of doing violence.

*State v. Snell*, 46 Wash. 327, 333, 89 P. 931 (1907).[4]

Here, the conditions that gave rise to Mr. Bost killing his wife have not changed. There is no evidence he has successfully treated his alcohol and drug addictions. His bipolar disorder with psychotic features and his neurocognitive disorders are unchanged. As his own expert testified, not only was Mr. Bost markedly psychiatrically afflicted

---

[4] Mr. Bost suggests that we should require the State to prove that he had committed a recent overt act in order to sustain the first two challenged findings. In making this argument, he relies on a standard applicable to involuntary commitment hearings. *See In re Harris*, 98 Wn.2d 276, 284, 654 P.2d 109 (1982) ("likelihood of serious harm," as defined by former RCW 71.05.020(3) (1979), requires a showing of a substantial risk of physical harm as evidenced by a "recent overt act"). We disagree with his argument.

An involuntary commitment hearing occurs promptly after a person is detained. Thus, a requirement of a recent overt act makes sense. On the other hand, the trial of whether a person should be acquitted of a criminal act on the grounds of insanity often occurs long after the person is arrested and placed in a controlled setting—a setting where the person receives prescribed medications and cannot obtain alcohol and illegal drugs. Requiring the State, in this context, to prove a "recent overt act" would too often result in

when he murdered his wife, but "[h]e is extremely neuropsychiatrically afflicted *right now* under the best of circumstances on medication regularly, not taking any substances, etcetera." RP at 177 (emphasis added). Moreover, one or more of these conditions led to past criminal acts—first degree robbery, two driving while intoxicated charges (although reduced down), and first degree murder. We conclude there is substantial evidence to support the first two challenged findings.

2.    *Expert testimony should be taken to determine whether treatment less restrictive than a state mental hospital is appropriate*

Neither expert testified whether treatment less restrictive than a state mental hospital is in the best interests of Mr. Bost and others. In contrast, there was clear evidence that Mr. Bost's mental conditions or defects that caused him to murder his wife had not abated.

As noted above, defense expert Dr. Adler testified that Mr. Bost "is extremely neuropsychiatrically afflicted right now under the best of circumstances on medication regularly, not taking any substances, etcetera." RP at 177. In addition, based on Mr. Bost's PAI results, Dr. Adler testified that the "nature of some of these problems suggests that treatment would be fairly challenging, with a difficult treatment process and the

the release of persons—who have admitted to committing the charged act and have been found insane by the court—without appropriate safeguards.

probability of reversals." CP at 406. He opined that Mr. Bost may have trust issues with a therapist, may have difficulty participating meaningfully in treatment, and may react to a therapist in a hostile or derogatory manner. Given the generous standard of review that we must apply, we probably could sustain the trial court's third finding. But we choose not to.

Rather, recognizing that a clear expert opinion on this challenged finding would benefit Mr. Bost and the public, we remand to the trial court for an evidentiary hearing on this issue and for the trial court to enter supplemental findings of fact and conclusions of law.

Affirmed in part; remanded.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, A.C.J.

WE CONCUR:

_____
Fearing, J.

_____
Staab, J.